[No. 13155. Department One. September 15, 1916.]

## E. L. BLANCK et al., Respondents, v. PIONEER MINING COMPANY et al., Appellants.[1]

MINES AND MINERALS—SALE—CONTRACTS—CONSTRUCTION—"INCLUD-
ING." In a contract for the sale of a mine under which the net profits
were to be determined by deducting the actual expenses of the
labor, "including" the wages of men, compensation for teams, cost
of board, lodging, fuel and 25 cents per miner's inch for water, the
word "including" introduces an enlarging definition of the preceding
general words "actual cost of labor," but excludes further enlarge-
ment than that furnished by the enlarging clause; hence, does not in-
clude cost of materials or supplies such as shovels, picks and lumber.

SAME. Such clause does not authorize a charge for water at more
than the specified rate for water used; notwithstanding the method
of mining was changed from steam and low pressure water to high
pressure water, increasing the amount of water used but lessening the
cost of the operation, where the method was under the absolute con-
trol of the operator of the mine making the change.

SAME—SALE — VALIDITY — EQUITY — SPECULATIVE CONTRACT. The
fact that a mine could not be worked at a profit without a change to
the hydraulic method, greatly increasing the amount of water to be
used and charged for at a specified rate in figuring the net profits,
does not authorize a court of equity to grant relief on the theory
that it would be unconscionable in an action for an accounting to
enforce the contract; as the court cannot relieve from and nullify
speculative contracts.

EVIDENCE—PAROL TO VARY WRITING—SUFFICIENCY—MINING CON-
TRACT. An oral modification of a mining contract with reference to
the amount to be charged for water is not established where evidence
of notice of the change was vague and contradicted and the other
parties to the contract never agreed to pay the higher charge.

ESTOPPEL—IN PAIS—SILENCE—PREJUDICE. An estoppel to object
to an increased charge for water used under a mining contract, upon
changing to the hydraulic method, is not created by silence follow-
ing the rendering of a statement of the profits showing the increased
charges, where the statement was not rendered until more than half
of all the expense had been incurred for high pressure water, and
under the contract there was no right to make such increased charge;
since the silence did not actually mislead the other party or operate
as a fraud.

[1]Reported in 159 Pac. 1077.

SAME—BURDEN OF PROOF. The burden of proving that silence, to create an estoppel operated as a fraud or was intended to mislead and would be acted upon, is upon the party invoking the estoppel.

ACCOUNT STATED—ACQUIESCENCE. The rendition of a statement of an account containing deductions does not create an account stated, though not objected to, where there was no right to make the deductions and no reasonable grounds for belief that the other party would rely or act upon silence or acquiescence.

CONTRACTS — CONSTRUCTION BY PARTIES — PAROL EVIDENCE. Contemporaneous construction cannot be invoked by parol evidence as against the clear terms of an unambiguous written contract.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered March 31, 1915, upon findings in favor of the plaintiffs, in an action for an accounting, tried to the court. Affirmed.

*Cornelius D. Murane* (*Metson, Drew & Mackenzie*, of counsel), for appellants.

*Lyons & Orton*, for respondents.

ELLIS, J.—Action in equity for an accounting. The following facts are undisputed. Prior to September 1, 1909, plaintiffs owned a leasehold interest in "Bench Claim Number Six Below Good Luck on the Left Limit of Anvil Creek," in the Nome Mining District, in Alaska, in the following proportions: C. A. Vogel one-eighth, E. L. Blanck one-half, H. B. Ames three-eighths. Their lease authorized them to extract the gold, paying to the owners of the claim a royalty of thirty-two and one-half per cent of the gross output. On September 1, 1909, by written agreement, they sold their interests to defendant Lindeberg for a total consideration of $70,000, of which $55,625 was then paid in cash. The balance, $14,375, was to be paid to plaintiffs in proportion to their respective interests, at times, in manner, and under conditions as follows:

"When the party of the second part shall have realized as net profits from the working of said claim the sum of $55,-625, there shall be paid monthly thereafter, to the parties of

the first part, one-half of the additional net profits derived from the working of said claim, until the parties of the first part shall have received the said additional sum of $14,375.

"The net profits hereinbefore mentioned shall be construed to mean the net profits of the entire claim including the Neussler one-fourth interest and shall be computed and calculated in the following manner:—From the gross amount of the gold produced from said claim shall first be deducted the royalty to be paid to the owners, and the only further deduction to be made shall be the actual expense of the labor engaged in the mining operations thereon, including the wages of the men, and reasonable compensation for any teams used, also cost of board and lodging for men employed, cost of all fuel used, and a charge of twenty-five cents per miner's inch of eleven and one-half gallons for each twenty-four hours of water used in mining on said claim."

Defendant was to have exclusive management and control of the mining operations and agreed to keep a full, true and correct account of the expenses incurred and of the gold produced, and to allow plaintiffs to inspect and take copies of such account, if desired, at any and all convenient times.

Defendant Lindeberg was president and manager of defendant Pioneer Mining Company. He at once took possession of the claim and proceeded to extract the gold from it, operating through that corporation. No question is raised as to his right to do so.

Preparatory to sluicing, it was necessary to thaw the perpetually frozen gravel containing the gold. This could be done by either of two methods. One by introducing steam through steel pipes called points, in which case high pressure water was unnecessary, both the thawing and hoisting to the sluice boxes being done by steam; the other, by playing a stream of water on the gravel bank, in which case high pressure water was essential and could be used both for thawing and raising the gravel to the sluice boxes by hydraulic elevators. The latter method eliminated the use of an engine, the expense of fuel for generating steam, and reduced the number of men necessary to perform the work.

Prior to the sale, plaintiffs had been operating by the former method, and defendants so continued till in 1910, when the Pioneer Mining Company acquired control of the Miocene Ditch Company, whose ditch was high enough to produce a pressure sufficient to make the hydraulic method practicable. Thereafter defendants employed the latter method. Through the Miocene ditch, water could be delivered at the mine at a cost of about fifty cents per miner's inch. Defendants operated the mine during the latter part of 1909 and the full mining seasons of 1910, 1911 and 1912. These operations exhausted the claim. It is admitted that the total amount extracted by defendants was $269,838.86 in gold. Defendants, in their accounts, in addition to unquestioned rightful deductions for royalties, low pressure water and labor expenses, charged as expenses and deducted from this gross output $11,133.46 for material and supplies, and $60,-296.33 for high pressure water, charging fifty cents per miner's inch computed at nine gallons to the inch. The latter item computed at eleven and one-half gallons to the inch would amount to $47,187.50, and if computed at twenty-five cents an inch would amount to $23,593.75. Disputed questions of fact will be considered in our discussion.

Defendants' statement reduced the net profits much below the $55,625 which, under the contract, they were entitled to retain from the first net profits. Plaintiffs insist that, in computing net profits, nothing should be deducted for materials and supplies; and for the water used, only twenty-five cents for each miner's inch of eleven and one-half gallons. Such was the final issue. The trial court, adopting the latter view, found that the total net profits were $80,777.03. This would leave, after deducting the $55,625, the sum of $25,-152.03, one-half of which under the contract plaintiffs would be entitled to in the proportion of their respective interests. The sum of $650, prior to suit, had been paid to Blanck. The court accordingly entered judgment in favor of Blanck for

$5,638, in favor of Ames for $4,716, and in favor of Vogel for $1,572, with interest on these sums. Defendants appeal.

Appellants contend that, in the paragraph of the contract above quoted defining net profits, the clause "the only further deductions to be made shall be the actual expense of the labor engaged in the mining operations thereon, including the wages of the men," etc., must be construed as including in the deductions the cost of all materials and supplies necessary to enable the men employed to perform their work; because, as it is argued, the word "including" is a term of enlargement and not a term of limitation, and necessarily implies that something is intended to be embraced in the permitted deductions beyond the general language which precedes it. But granting that the word "including" is a term of enlargement, it is clear that it only performs that office by introducing the specific elements constituting the enlargement. It thus, and thus only, enlarges the otherwise more limited preceding general language, "the actual expenses of the labor engaged," by making it embrace not only "the wages of the men and reasonable compensation for any teams used" (which the preceding general language alone would have embraced in any event), but "also cost of board and lodging for men employed, cost of all fuel used, and a charge of twenty-five cents per miner's inch of eleven and one-half gallons for each twenty-four hours of water used in mining on said claim," which the preceding general language otherwise would not have covered. The word "including" introduces an *enlarging definition* of the preceding general words, "actual cost of the labor," thus of necessity excluding the idea of a further enlargement than that furnished by the enlarging clause so introduced. When read in its immediate context, as on all authority it must be read, the word "including" is obviously used in the sense of its synonyms "comprising; comprehending; embracing." *Neher v. McCook County*, 11 S. D. 422, 78 N. W. 998; *Hibbard v. Slack*, 84 Fed. 571; *Brainard v. Darling*, 132 Mass. 218; *State v.*

*Montello Salt Co.*, 34 Utah 458, 98 Pac. 549. We find no warrant in the contract for including in the deductions from the gross output the cost of materials and supplies, such as shovels, picks and lumber.

It is equally plain that, under the contract, appellants were not authorized to charge for any of the water more than "twenty-five cents per miner's inch of eleven and one-half gallons for each twenty-four hours of water used in mining on said claim." The language used is too plain and exact, both as to the charge per inch and in defining the inch, to admit of construction. It is argued that the main object of the contracting parties was to recover the greatest amount of gold at a minimum cost, and that this implied the right to substitute for the steam point method the hydraulic method as a necessary means to attain that end. But the argument is superfluous. The contract itself gave to appellant Lindeberg "the exclusive management and control of said mining operations . . . to be conducted, however, as hereinbefore provided," and it was thereinbefore provided that he should "prosecute diligently and in a minerlike fashion" the work on the claim. Obviously, he had the right to choose his own method of operation within the limits of miner-like work. There is, however, neither provision nor implication in the contract that he might add to the contract charge per miner's inch for water or change the contract definition of the inch, in his deductions to determine the net profits. We are not concerned with the meaning of net profits in the abstract or in other circumstances. By their contract, the parties here have defined net profits, fixing therein the charge of twenty-five cents per inch for water without exception. It is undisputed that the parties knew that high pressure water would cost more than low pressure water, yet in their solemn written contract they did not specify the kind of water to be used nor make any distinction in the charge for water to be deducted, whether high pressure or low pressure were used. The same is true as to the saving of men and fuel resulting from

the employment of the hydraulic method. Both parties, as practical miners, knew that this would result, yet neither saw fit to insert in the contract an increase of the charge per inch for water in that contingency. ·

But appellants argue, on the theory of specific performance, that, since it was soon demonstrated that the entire claim could not be worked to a profit without the employment of the hydraulic method, it would be unconscionable to enforce the contract as plainly written. Such a doctrine would tend to nullify every speculative contract. Here the whole enterprise was speculative. Each party took a chance on the output of the mine. Suppose it had produced in net profits millions of dollars, could respondents claim the right to anything more than one-half of the first $28,750 of such profits? Of course not, and the converse is equally palpable. Equity has never presumed to rewrite contracts for parties *sui juris* merely because of disappointed expectations.

"Equity will not relieve against hardship arising from a change in circumstances or the result of subsequent events, *where these should have been in contemplation of the parties as possible contingencies*, when they entered upon the agreement. And of such nature are the ordinary changes like a rise or fall in values, profit or loss in the undertaking, mistakes of judgment, unforeseen events, which yet were fairly possible contingencies, etc." 6 Pomeroy, Equity Jurisprudence, § 797.

Appellants, in their second affirmative defense, alleged in substance that, shortly after their taking possession, they learned, and so advised respondents, that the claim could not be worked at a profit except by the hydraulic process, that respondents then "consented to the change of process in mining and the increased cost for water." They further alleged that respondents, after receiving written statements of account showing the amount paid for water and included in the expenses, did not object to any items of expense so included until long ·after all mining operations were completed; that appellants relied upon the consent, silence and acquiescence

of respondents when incurring the expenses, particularly the added expense for water, and that respondents are estopped to dispute the items of account.

The trial court found against appellants on this second affirmative defense and we are clear that the evidence preponderates in favor of that finding. As to the vaguely pleaded oral modification of the contract, the evidence shows no more than that Blanck and Vogel were informed of the change from the old method of mining to the hydraulic method and that it would increase the actual cost of water, soon after the change. Lindeberg testified, "So far as I remember, Mr. Blanck never objected to our change of method of mining, but rather approved it all," and that Vogel "expressed his satisfaction." He also testified that, in the fall of 1910 or 1911, he had a very short conversation with Ames somewhere in Seattle in which he told Ames of the change of method. Ames denied this meeting and this conversation *in toto*. Neither Lindeberg nor any other witness testified that, in any of these conversations or at any other time, either of respondents ever agreed that the actual cost of the high pressure water should be deducted instead of twenty-five cents an inch in determining the net profits as defined in the written contract, or ever consented to any change in that contract, or that such consent was ever requested.

The issue is thus reduced to the claim of estoppel because of respondents' alleged failure to object to certain statements of account sent to them showing charges of fifty cents an inch for high pressure water and charges for materials and supplies. But the evidence shows that neither Blanck nor Ames received any statement including an increased charge for high pressure water until in August, 1911, and it fairly appears that Vogel, though on the ground, received no such statement till in July, 1911. This was after more than half of all the expense ever incurred for high pressure water had been created. Clearly appellants did not rely upon the con-

sent, silence and acquiescence of respondents as to these statements of account when incurring the added expenses for water. Full knowledge of the facts is essential to create an estoppel by silence or acquiescence. *Oliver Ditson Co. v. Bates*, 181 Mass. 455, 63 N. E. 908, 92 Am. St. 424, 57 L. R. A. 289; *Hunt v. Reilly*, 24 R. I. 68, 52 Atl. 681, 96 Am. St. 707, 59 L. R. A. 206. Respondents knew that appellants had adopted the hydraulic process, but they also knew that, under the contract, Lindeberg had the right to adopt whatever method he pleased. They did not know till they received these statements that deductions above the contract charge for water were being made. Certainly until then they were under no duty to speak. Though the evidence on this point was conflicting, the trial court evidently believed—and so do we—that Blanck at least then did object to these charges. But even assuming that none of the respondents then objected, no estoppel arises. Appellants, having proceeded at least till July, 1911, without any possible ground for reliance upon respondents' silence or acquiescence, the presumption must prevail that they continued to use the high pressure water without such reliance. Mere silence, without positive acts, to effect an estoppel must have operated as a fraud, must have been intended to mislead, and itself must have actually misled. The party keeping silent must have known, or had reasonable grounds for believing, that the other party would rely and act upon his silence. The burden of showing these things rests upon the party invoking the estoppel.

"Mere silence on the part of a party will not create an estoppel unless he was under some obligation to speak, and a party invoking such estoppel must show that it was the duty of the other to speak, and that he has not only been induced to act by reason of such silence, but that the other had reasonable cause to believe that he would so act." *Newhall v. Hatch*, 134 Cal. 269, 66 Pac. 266, 55 L. R. A. 673.

Appellants having for so long proceeded without any possible reliance upon respondents' silence, respondents might

well have assumed that their attitude was a matter of indifference to appellants and that no speech of theirs would then influence appellants' future conduct. And in fact, as the evidence fairly shows, Blanck's objections in 1911 were wholly unheeded.

It is true that, in the fall of 1909, appellants rendered a statement containing charges for materials and supplies but no excess charge for water, and that no objection was made to this statement until Blanck's objection in 1911. But appellants knew that they had no right, under the contract, to deduct more than twenty-five cents an inch for any water, and no right to deduct anything for materials and supplies. Under the circumstances of this case, their rendition of statements of account containing these deductions, though the statements were not objected to, could not create an account stated nor operate as an estoppel as against respondents to dispute the account and rely upon their contract. *Kusterer Brewing Co. v. Friar*, 99 Mich. 190, 58 N. W. 52; *Gallinger v. Lake Shore Traffic Co.*, 67 Wis. 529, 30 N. W. 790; *Valley Lumber Co. v. Smith*, 71 Wis. 304, 37 N. W. 412, 5 Am. St. 216.

Some contention is made that the failure to object to the 1909 statement amounted to a contemporaneous construction of the contract as to the charge for materials and supplies. But contemporaneous construction cannot be invoked as against the clear terms of an unambiguous written contract. To hold otherwise would be wantonly to impinge the rule that such a contract cannot be varied by parol evidence.

Upon the whole record, we are satisfied that the trial court reached the correct conclusion.

Judgment affirmed.

MOUNT, FULLERTON, and CHADWICK, JJ., concur.