# IN THE MATTER OF THE ESTATE OF JAMES CAMPBELL, DECEASED.

## Nos. 2488 and 2489.

ARGUED JANUARY 6, 1944.　　　DECIDED FEBRUARY 17, 1944.

KEMP, C. J., PETERS, J., AND CIRCUIT JUDGE RICE IN PLACE OF LE BARON, J., DISQUALIFIED.

632

OPINION OF THE COURT BY PETERS, J.

These are petitions by the trustees under the will and of the estate of James Campbell, deceased, for the allowance of their accounts as such for the calendar years ending December 31, 1938, and December 31, 1940, respectively.

In both accounts there came in issue the allowance to the trustees of the following items of expense incurred by them: Expense of clerical services, *i.e.*, the respective monthly salaries of part-time clerks in the business office of the trust, *viz.*, superintendent and secretary, collector and overseer, cashier and accountant, and stenographer and typist, and the additional compensation paid each at the end of the year at Christmas by way of bonus; the federal social security and the territorial unemployment relief tax paid upon the salaries of each; the annual premiums upon the fidelity bonds of the collector and overseer in his capacity as collector, and of the cashier and accountant in his capacity as cashier; and the fees paid an independent tax expert. All of these items were accounted for by the trustees as expenses chargeable to realty with the exception of the premiums upon the fidelity bonds and a portion of the fee paid the tax expert which were returned by the trustees as general expenses. The clerks, other than the superintendent and secretary, were also employed by the latter who carried on his own business in the same office as the Campbell Estate.

The expense of clerical assistance was disallowed by the circuit judge (Hon. H. E. Stafford) to whom were submitted the 1938 accounts. In addition he surcharged the trustees and their predecessors in office the salaries paid for clerical services for periods prior to the accounting period. He also surcharged the trustees with agent's commissions earned by the superintendent and secretary upon premiums paid for fire insurance effected by the superintendent and secretary in his capacity as agent of the insurance company during the accounting period, and

took similar action against a former trustee who as agent of the insurer effected similar insurance prior thereto. The same items of expense disallowed in respect to the 1938 accounts were allowed by the circuit judge (Hon. Louis Le Baron) who heard the petition for the allowance of the trustees' 1940 accounts.

The decree of the circuit judge disposing of the 1938 accounts is before this court upon the appeal of the trustees; the decree disposing of the 1940 accounts is upon the appeal of Princess Abigail Kawananakoa, one of the life tenants, hereinafter referred to as the "beneficiary." The cases having been consolidated, one opinion will suffice for both.

First to be considered are the charges for clerical expense and fees paid a tax expert, including the ancillary items of additional annual compensation or bonus to clerks, federal and territorial taxes legally assessable in relation to salaries paid, and premiums upon clerks' fidelity bonds. The beneficiary contends: (a) that the clerical services performed by the several clerks, the compensation of whom the trustees prayed allowance in both the 1938 and 1940 accounts, were ordinary services, *i.e.*, services within the skill and experience of the ordinary trustee to perform and should have been personally performed by the trustees themselves; that under the rules of law enunciated by this court in the matter of the *Estate of Mary E. Foster*, 34 Haw. 417, the compensation paid to clerks for clerical services within the capacity of the ordinary trustee to perform was chargeable against the trustees personally and not against the estate, and that as a consequence the federal social security tax and the territorial unemployment relief tax paid upon such compensation, and the premiums upon fidelity bonds, were chargeable personally against the trustees as their employers and not against the estate; and (b) that it did

not appear that the services performed by the tax expert, the compensation of whom the trustees prayed reimbursement, were "special services" within the meaning of that term as employed in Revised Laws of Hawaii 1935, section 3793, or extraordinary services, *i.e.*, services beyond the skill and experience of the ordinary trustee.

The trustees on the other hand contend: (a) *res adjudicata*; (b) that the will of the decedent expressly authorizes the trustees to pay the expense of clerical assistance out of the funds of the estate, relying upon the provision contained in the eighth paragraph of the will that "With respect to all property which shall be so distributed to them, other than that mentioned in the last preceding paragraph [the residence houses and premises of the decedent situate on Emma Street, Honolulu, and Leahi, otherwise disposed of], I direct my trustees aforesaid, to reduce it to possession, and to hold, manage, control, preserve, and direct it; and *to pay all costs and charges thereof, including their own commissions for such administration*" (italics supplied) ; (c) that if not so expressly authorized, the magnitude of the trust estate and the performance by them of their nondelegable duties made the employment of clerical assistance necessary, the same contention advanced and adopted by this court in the case of *Estate Bernice P. Bishop*, 36 Haw. 403, and that the reasonable cost thereof was a proper charge against the estate; and (d) that the employment of clerical assistance, the reimbursement of the compensation of which was prayed, was necessary and the salaries paid reasonable.

Our conclusions obviate consideration of the plea of *res adjudicata*.

In our opinion the trustees are entitled to reimbursement for the compensation paid for clerical assistance, whether ordinary or special, including the ancillary charges for taxes and premiums upon fidelity bonds.   The

services performed by the part-time clerks employed in the office of the estate and by the independent tax expert were within the delegable duties of the trustees; their employment was within the discretion of the trustees and no abuse of discretion appearing and the salaries and fees paid being reasonable, the trustees should be reimbursed in the amount thereof together with the necessary ancillary expense of their employment.

Trustees of a trust estate unquestionably possess the power to employ clerical assistance in the execution of their delegable duties. In the exercise of such power, the only question that can come in controversy is whether such employment is at their own expense or at the expense of the estate of which they are trustees. In the instant case all question of liability for the employment of clerical assistance is removed by the express provision contained in the eighth paragraph of the will of the decedent directing his trustees "to pay all costs and charges thereof, including their own commissions for such administration." The word "thereof" should be construed as referring to the administration of the trust estate. It refers to the antecedent words "to hold, manage," etc. And "to hold, manage," etc., is later defined in the same sentence as "administration." Intrinsic in the direction to pay all costs and charges of administration is the power reposed in the trustees in their discretion to employ such clerical assistance as they may deem reasonably necessary in the administration of the trust. So long as no abuse of discretion appears and the salaries or fees paid are reasonable, the trustees are entitled to reimbursement of the expense thereof including such costs and charges as taxes and premiums. on fidelity bonds inherent in such employment.

The will is the law of the case. If clerical services, the compensation of which is included in the terms "costs"

and "charges" within the meanings of those terms as employed in the will, overlap or include services, compensation of which is covered by the statute applicable to the commissions of trustees, the terms and provisions of the will and not of the statute control. Hence the test enunciated in the *Foster* case of whether the services, reimbursement of the compensation of which is prayed, were beyond or within the skill or experience that might be expected of the ordinary trustee, does not apply. Nor is it material, if true, that the magnitude of the trust estate and the performance by the trustees of their nondelegable duties made the employment of clerical assistance necessary. The thesis of the majority opinion in the case of *Estate Bernice P. Bishop, supra,* is equally inapplicable. In the instant case, differently from the *Foster* or the *Bishop Estate* case, express provision was made by the testator in his will for the payment out of the estate of all costs and charges of administration and this provision of the will controls.

The meaning and intent of the direction contained in the will "to pay all costs and charges thereof, including their own commissions for such administration" seems to us to be clear and free of any ambiguity. Moreover, any doubt that may be interjected is removed by a consideration of all the terms and provisions of the will viewed in the light of the facts and circumstances surrounding the testator at the time the will was executed.

The first to the tenth paragraphs, both inclusive, and the twelfth and sixteenth paragraphs of the will of the testator are quoted in full in the case of *Campbell Est.* v. *Campbell-Parker,* 18 Haw. 34, *aff'd* 216 U. S. 367. To avoid repetition a quotaton of a resume of the material terms and provisions of the will found in the opinion of the United States Supreme Court upon affirmance will be of assistance in analyzing their legal effect: "By the

first clause of the will the executors were to reduce all the estate, real and personal, to possession, to collect the income thereof 'pending the distribution thereof' as thereinafter provided and to have the value adjudged. By the second, they were to pay the debts and funeral expenses. By the third, there was given to the widow a sum of money equal to one-third of the value of the personal property only, adjudged as above, after payment of debts, etc. This sum was to be paid in cash, and if the condition of the estate should not warrant the payment of the whole at one time, then it was to be paid 'as rapidly as the income and interests of my estate shall permit, without the sale of any real estate, or the sacrifice of any personal property, as a means of raising such sum * * *.' The fourth clause gives the use and occupation of the testator's dwelling house and grounds, furniture, horses, carriages, etc., to the widow, and to the children so long as they remain unmarried, and the executors or trustees are to keep the house and grounds in suitable condition and repair at the charge of the estate; with further details. The fifth clause directs the executors to pay to the widow ' * * * a family allowance' * * * . By the sixth clause, after satisfying the second and third, the executors 'shall, as soon as may be, conclude the probate proceedings hereunder, and obtain a decree of distribution of my estate,' and the testator gives to the trustees and to those living and resident within the Hawaiian Islands at the date of such decree all the residue of the estate not before otherwise devised or bequeathed.

"The trusts, * * * after a further provision in clause seven as to the house and grounds and their contents, are as follows: 'Eighth. With respect to all property which shall be so distributed to them,' except that mentioned in seven, the trustees are to reduce it to possession and manage it, paying charges and their own commissions. 'And

to collect all the rents, issues, profits, income and revenue thereof' * * * 'and to invest and reinvest, and keep invested, and at will to change the investment of any and all moneys that shall come to their hands by virtue hereof' not otherwise specially disposed of, 'and to segregate, and keep separate and apart, (during the life of my wife,) the accounts of and pertaining to the realty of my Estate from the accounts pertaining to any and all other thereof.' 'Ninth: And from and out of the net income, rents, issues and profits of and from the realty last aforesaid said Trustees shall pay the equal One Third part or portion thereof, in semiannual or, (at the discretion of said Trustees,) more frequent payments, to my said wife, for and during the remainder of her natural life.' *Habendum* to her absolutely. By the tenth clause the remaining two-thirds of the net income 'from said realty' are given to the children with a proviso for their minority and making surplus revenues capital."

The full text of the tenth paragraph of the will follows: "And the remaining Two Thirds of the net income, rents, issues and profits of and from said realty, during the natural life of my said wife, and, after her death, the entire net sum thereof, shall be by my said Trustees included in one fund with the net income and revenue of and from all my Estate other than such realty, which shall be under their control by virtue of this Will, and such fund shall be by them at stated intervals of not more than six months, divided into as many equal parts as there shall be then *in esse* any of my children by my said wife, and shall be by said Trustees paid to my said children, from and after their respective majority or marriage, share and share alike; PROVIDED, that if any of my said children shall decease, leaving lawful issue, such issue shall stand in the place or places of his, her, or their parent or parents in all respects concerning the division, payment

and receipt of the fund herein mentioned; and FURTHER PROVIDED that during the minority of said children respectively, and while they shall respectively remain unmarried, within such minority, said Trustees shall provide him, her or them being so minor and unmarried, with suitable maintenance and education, and funds for foreign travel, in so far as the same shall be suitable and desirable to their means and condition; and all sums expended under this provision shall be charged to Family Maintenance, and none of it shall be charged to said children, or any of them, individually. And any surplus revenues arising or remaining under the provisions of this paragraph, shall become a part of the principal of my Estate, and shall be invested and reinvested as such. The sums expended for family maintenance hereunder shall not be reckoned as a part of such net income as herein provided."

In connection with the tenth paragraph of the will, the observation of this court in *Campbell Est.* v. *Campbell-Parker, supra,* at page 44, is noteworthy: "It is only after the administration is closed and the estate is distributed to the trustees that either the widow or any of the children begin to share in the income and it is only from that time that the accounts are to be kept separate and the income apportioned. * * * these interests are contingent. The vesting is postponed until majority or marriage."

The eleventh paragraph of the will of the testator restrains all beneficiaries, devisees or legatees from anticipating income, or alienating his or her interest, or voluntarily or involuntarily disposing of his or her interest in the estate. The twelfth paragraph of the will is as follows: "It being my purpose herein to provide a safe and certain income and maintenance for my wife, our children and grandchildren, for and during the period of the trusts hereby established, I do will and direct that

each female beneficiary hereunder shall receive and hold all moneys and other rights and privileges herein provided for, free from the debts and control of any husband she may have after the date of the execution of this Will, —and that the Trustees herein named, and their successors in trust hereunder, shall keep intact my Estate, and administer the same under the name of 'The Estate of James Campbell',—and that the realty thereof, (except as herein provided in the case of said residence premises) shall be particularly and especially preserved intact, and shall be aliened only in the event, and to the extent, that the obvious interests of my Estate shall so demand." The thirteenth paragraph of the will is concerned with the duration of the trust. It is therein provided that the authority of the trustees should "continue during the natural life and lives of my said wife, and of my children by my said wife, who shall be *in esse* at the date of my decease, and the survivor of them; and, if there shall be *in esse*, at the death of such survivor, any lawful issue of any such child as last aforesaid, then these trusts, and the authority of said Trustees thereunder, shall further continue for the definite term of Twenty Years after the decease of such survivor, PROVIDED any such lawful issue as aforesaid shall live so long, and if not, then for such lesser term and period as he, she or they shall live." A discussion of the legal effect of the provisions of the thirteenth paragraph of the will is to be found in the opinion of this court in the matter of *Campbell* v. *Kawananakoa*, 31 Haw. 500. The fourteenth and fifteenth paragraphs of the will are immaterial to our consideration. The sixteenth paragraph of the will provides that the bequest to the wife is in lieu of dower. The seventeenth paragraph requires the trustees to furnish each beneficiary, devisee and legatee, during the month of January of each year, a complete and detailed account and statement of the receipts, expendi-

tures, transactions, assets and liabilities of the estate for the preceding year, and the filing of the same with the Hawaiian court having probate jurisdiction for its approval, modification or surcharge upon legal notice to all concerned. The twentieth paragraph provides that for any act authorized by the will the concurrence of any two of the executrix, executors and trustees shall suffice; that if one executrix, executor or trustee shall dissent from the others in regard to any considerable transaction or respecting the general course pursued by the majority, it shall be the duty of such dissentient to state the reasons for his or her dissent in the annual report of the executrix and executors or in the next annual report of the trustees, as the case may be.

It should be noted that the only bequest is that to the widow; that the interests of the *cestuis que trustent* are confined to income and that the corpus may not be invaded; on the contrary the will contains express directions that the bequest to the wife be paid "as rapidly as the income and interests of my estate shall permit, without the sale of any real estate, or the sacrifice of any personal property," and "that the Trustees herein named, and their successors in trust hereunder, shall keep intact my Estate, and administer the same under the name of 'The Estate of James Campbell',—and that the realty thereof, (except as herein provided in the case of said residence premises) shall be *particularly* and *especially* preserved intact, and shall be aliened only in the event, and to the extent, that the obvious interests of my Estate shall so demand." (Italics supplied.)

Much of the legal background and recitals of the facts and circumstances existing at the time the testator executed his will may be found in the cases involving the will of the testator cited herein. By stipulation of the parties, the record in the matter of the estate of James

Campbell, deceased, including all the accounts filed in probate and on the equity side of the first circuit court, is in evidence and the facts referred to are deducible therefrom.

The will of the testator was executed in July, 1896. The testator died in April, 1900, survived by his wife and all their children—four daughters of the ages of twenty, eighteen, nine and five years, respectively.

It is apparent from the terms and provisions of the will of decedent, and especially paragraph twelfth thereof, that the dominant intention of the testator was to provide a safe and certain income for his wife and children and grandchildren for and during the period of the trust created thereby. The estate distributed to the trustees consisted of real property, principally cane and ranch lands and improved Honolulu business property. In 1902 the real estate was appraised at $920,180, notes and mortgages at $351,930, and stocks and bonds at $218,840. This court has previously observed in this regard that "The desire to conserve the estate and provide at all times sufficient funds for the maintenance of the widow and children is clearly indicated all through the will." *Campbell Est.* v. *Campbell-Parker, supra,* at page 40. As a vehicle for the accomplishment of his dominant intention, the testator chose a testamentary trust calculated to endure for the life or lives of his children and twenty years afterwards, the principal of which was to remain intact under terms and provisions safeguarding disintegration from within or without.

The testator unquestionably visualized what might be reasonably expected to evolve from a testamentary trust composed principally of valuable cane and ranch lands and improved Honolulu business property kept intact for the joint lives of his widow and four surviving children and twenty years afterwards, and protected by limitations

upon the authority of the trustees to sell and restrictions upon the power of the beneficiaries to alien their interests. In July, 1896, when the testator made his will, annexation of the Islands to the United States of America was inevitable and actually occurred prior to his death. The future of the Islands generally and the sugar industry in particular was assured. He, no doubt, appreciated that with increased prosperity his estate would assume proportions requiring not alone competent managerial personnel but also extensive clerical assistance. He knew or must be presumed to have known the common-law duty of trustees to keep accounts. In the absence of a statutory requirement for filing accounts, he expressly provided that this be done, including a detailed account and statement of the "transactions, assets and liabilities" of the estate, and any dissents in regard to "considerable transaction or respecting the general course pursued by the majority," with the reasons therefor. Accordingly he conferred upon his trustees, in addition to the general and special powers conferred upon them in the administration of the trust estate, the express power to pay all costs and charges of administration, including their own commissions.

The words "costs" and "charges" as used in the will of the testator were not used as words of art. They contain no legalistic significance. The context indicates they were used according to their respective commonly-accepted meanings. In the margin are quoted definitions from the standard dictionaries and lexicons.[1] It will be seen that

---

[1] "Cost, *vt.* 1. To call for as a price in exchange; cause the expenditure of; require as the price of possession, use, or accomplishment. * * * cost, *n.* 1. That which has to be given for a thing in order to procure it; especially, the price paid; outlay of any kind; expense. * * *

"Charge, *v.* * * * 4. To set or state as a price or sum due; ask or require as compensation; demand; as, to *charge* two dollars a barrel for apples. * * * 6. To subject to or make liable for a tax, lien, or

the definitions of both words include "expenses." It may be said that as used conjunctively the connotations of each are different, the word "cost" connoting voluntary incurrence, the word "charges" involuntary incurrence or imposition by operation of law. But both words, whether used singly or in combination, include expenses and there can be no doubt the testator intended that all expenses incurred in the administration of the estate, whether voluntarily assumed or involuntarily imposed, should be borne by the estate. Nor does the inclusion of the phrase "including their own commissions" limit the meaning of the words "costs" and "charges" and restrict expenses to those necessarily incurred in the preservation of the estate to the exclusion of costs and charges for services within the duty and capacity of the ordinary trustee to perform. The word "including" is used in the will as a term of en-

---

other financial burden; put to expense; as, to *charge* land with a ground-rent. * * * II. *i.* 1. To demand or fix a price; ask payment * * * . charge, *n.* * * * 3. The price fixed or demanded for anything, as for a service rendered or merchandise sold; as, the *charge* is reasonable. * * * 5. Any burden or encumbrance upon public or private property or resources; tax; lien; expense; cost, as of living or administration; also, any accessory or incidental expense; as, the invoice showed the cost and *charges.* * * * " Funk & Wagnalls New Standard Dictionary (1931).

"Cost, *n.* * * * 1. The amount or equivalent paid, or given, or charged, or engaged to be paid or given for anything bought or taken in barter or for service rendered; charge; price; hence, whatever, as labor, self-denial, suffering, etc., is requisite to secure benefit. * * * 2. Loss of any kind; detriment; deprivation; suffering. * * * 4. Something expended; expense; * * * that which has involved expense. * * *

"Charge, *v.* * * * IV. To make liable for payment. 11. To subject to a pecuniary charge or liability; to impose or furnish as a charge; to make liable for. * * * *Intransitive:* * * * 2. To make a charge; to demand or set a price. * * * charge, *n.* * * * Cost. 11. *a* Pecuniary burden; whatever constitutes a burden on property, as rents, taxes, liens, etc.; expense incurred; as, maintained at great *charge.* *b pl.* Expenses * * * . 12. The price demanded for a thing or service. * * * " Webster's New International Dictionary (Second Edition, Unabridged, 1943).

largement and not a term of limitation and necessarily implies that something is intended to be embraced beyond the general language which precedes it.[2]

The phrase "including their own commissions" is not subject to the implication that although the testator said in his will that commissions were in addition to costs and charges, the expense of clerical assistance within the capacity of the trustees to perform should be deducted from those commissions. No such subtlety may be attributed to the testator. The word "including" is used in the sense of the conjunctive "and" or the phrase "in addition to." All the expenses of the trust were to be paid out of the trust estate and in addition thereto the trustees' own commissions. If the expenses of clerical assistance were chargeable against the trustees and not the estate, it could not be said that in so doing the trustees were paying all costs and charges and in addition thereto the trustees' own commissions. Obviously the trustees' commissions would be diminished to the extent that the costs and charges included the expense of clerical assistance within the capacity of the trustees to perform themselves.

If we are correct in our appraisal of the purposes and objects sought by the testator in creating the testamentary trust which he did, then it is clear that upon the trustees was conferred the sole discretion of determining the extent to which they might secure clerical assistance in performing their delegable duties. We are not advised of the business experience possessed by the widow of the testator or her qualifications to perform the services usually incumbent upon the ordinary trustee, but it is reasonable to assume that the testator did not intend to impose upon his wife, whom he appointed as one of the

2 *Blanck* v. *Pioneer Mining Co.*, 93 Wash. 26, 159 Pac. 1077, 1078; *State* v. *Salt Co.*, 34 Utah 458, 98 Pac. 549; *Prairie Oil & Gas Co.* v. *Motter*, 1 F. Supp. 464, 468; *In re Goetz's Will*, 75 N. Y. S. 750, 751.

three trustees and for whom he showed such profound solicitude, the burden of performing clerical services within the capacity of the ordinary trustee, or upon failure on her part to perform the services personally, to charge her with the cost of the performance of those services by others.

Holding as we do that the express provisions of the will control, the character of the services performed by the tax expert is immaterial. His services certainly were not special within the meaning of Revised Laws of Hawaii 1935, section 3793. Nor are we concerned whether they were expert or otherwise. Possessing the power in their discretion to employ clerical assistance, it was within the power of the trustees to employ an independent tax expert and unless in employing him such discretion was abused or the fees paid were unreasonable, the beneficiary cannot complain.

It appears that all the clerks employed in the office of the Campbell Estate annually received from the trustees additional compensation, referred to generally as a bonus. This additional compensation was paid at the Christmas season. The evidence abundantly sustains a finding that the bonuses paid were not mere gratuities but were given by way of additional annual compensation for services rendered during the past year and that the respective aggregate amounts paid as compensation, including bonus, were reasonable. Under the circumstances reimbursement of bonuses paid should be allowed. We are not advised of the value to the superintendent-secretary of the trust of the earned premiums of fire insurance effected by the trustees through him as resident agent of the insurers, the details of which are hereinafter set forth, hence we cannot say that this perquisite rendered his salary unreasonable. The evidence also sustains a finding that the fees paid to the independent tax expert were reasonable.

In disallowing reimbursement of these fees in respect to the 1938 accounts, the trial judge committed error.

Assuming but not deciding that the circuit judge was privileged to examine and act upon similar charges paid by the trustees out of the estate for clerical services prior to the accounting period, and that the surcharges against the trustees and their predecessors in the amounts thereof were upon the same grounds as their disallowance for the accounting period ending December 31, 1938, such surcharges were erroneous.

The federal social security and territorial unemployment relief tax assessed as an incident to the salaries paid clerks employed in the office of the estate come within the term "charges" as used in the direction under discussion and are properly chargeable against the estate. No question was raised as to legality of the assessments.

The payment of premiums upon fidelity bonds of clerks employed by the estate is challenged upon the ground that the same were unnecessary, the trustees themselves being under bond. We deem it unnecessary to discuss the liability of fiduciaries for default of their employees. It is sufficient to observe that ordinarily fiduciaries are not liable upon their official bonds for peculations which are the result of the fraud and misconduct of employees, in the selection of whom the fiduciary has exercised ordinary care.[3] Nothing has been pointed out to us from which it might be said that the bonds of the trustees subsisting during the accounting periods covered loss from fraud or misconduct on the part of employees. Under the circumstances the requirement of fidelity bonds for two of the clerks was for the benefit of the trust estate and the pre-

---

[3] 65 C. J., Trusts § 529; 2 Scott, Trusts § 225; Restatement, Trusts § 225; 3 Bogert, Trusts and Trustees, p. 1770; *Donaldson* v. *Allen*, 182 Mo. 626, 81 S. W. 1151, 1157.

miums paid therefor an expense of administration, properly chargeable against the estate.

Next to be considered are the surcharges imposed by the trial judge in the respective amounts of commissions received upon premiums paid by the trustees for fire insurance effected upon buildings of the trust estate.

The circuit judge before whom the 1938 accounts were pending found the following facts: "(7) * * * that the trustees and/or their predecessors in office allowed said Harry M. von Holt [a former trustee, since deceased], during the same period of time [in the year 1917 and down to the time of his death on July 3, 1927], to write fire insurance upon the properties of the Estate, on which insurance written said Harry M. von Holt earned agent's commissions of $10,403.82. (8) * * * that between July 3, 1927, and December 31, 1938, the trustees and/or their predecessors in office allowed said Herman V. von Holt [the same clerk heretofore referred to as the 'superintendent and secretary'] to write fire insurance upon the properties of the Estate, on which insurance written said Herman V. von Holt earned agent's commissions of $9,954.56. * * * (13) That during the period covered by the 1938 account, the trustees knowingly allowed the Bishop Insurance Agency, Limited, a company in which trustee J. K. Clarke is a director and financially interested, to write fire insurance upon the properties of the Estate, for which insurance written said Bishop Insurance Agency, Limited, earned agent's commissions amounting to $1,113.06. (14) That prior to 1938, and during said trustee Clarke's incumbency in office, the trustees and/or their predecessors in office knowingly allowed the Bishop Insurance Agency, Limited, a company in which trustee J. K. Clarke is a director and financially interested, to write fire insurance upon the properties of the Estate, for which insurance written said Bishop Insurance

650

Agency, Limited, realized agent's commissions amounting to $5,116.32. * * * (15) That all of the * * * commissions realized by the fire insurance agents noted, * * * were paid directly or indirectly from funds of the Estate and not from the individual moneys of the trustees and/or their predecessors in office." Upon such findings the circuit judge concluded as matters of law: "(a) That none of the * * * agents' fire insurance commissions * * * are proper charges against the Estate under the terms of the will of the * * * decedent; (b) That none of the * * * agents' fire insurance commissions * * * are proper charges against the Estate under the general law of fiduciary administration * * * ; (c) That the total amount of said * * * agents' fire insurance commissions * * * is surchargeable to the respective trustees incumbent at the time of the various payments aforesaid, or to their respective legal representatives or sureties; (d) That the trustees' commissions, to the extent that they were not reduced by the amount of * * * agents' fire insurance commissions * * * were * * * surchargeable in the amount of such * * * agents' fire insurance commissions." The court ordered, adjudged and decreed that the trustees repay to the said estate the sum of $6,229.38 on account of agent's fire insurance commissions realized by the Bishop Insurance Agency, Limited. It was further ordered, adjudged and decreed that the said trustees and their predecessors in office (and the legal representatives or sureties of the latter) because of their unlawful and improper expenditure from the funds of said estate as aforesaid should repay according to their respective liabilities "as the same may hereafter be determined by the appropriate court by reference to a master or otherwise, the sum of * * * $10,403.82 realized by Harry M. von Holt as agent's fire insurance commissions, * * * $9,954.56 realized by Herman V. von Holt as agent's fire insurance commissions * * * ."

These findings of fact and conclusions of law are assigned by the trustees as error.

It appears from the evidence that during the calendar year 1938, Herman V. von Holt, the superintendent-secretary of the James Campbell Estate, was and since July, 1927, had been the resident agent of certain insurance companies engaged in the business of insuring property against loss or damage by fire; that in part payment by the trustees for his services as such superintendent and secretary, the trustees placed with Mr. von Holt one half of the insurance effected by them during that year upon buildings forming a part of the trust estate, upon the premiums for which Mr. von Holt received commissions from the insurer; that this arrangement was the outgrowth of a similar arrangement with Mr. von Holt's father, the late Harry M. von Holt (a trustee of the Campbell Estate from December 24, 1908 to July 3, 1927); that the senior von Holt, similarly as his son who succeeded him in business, was the local agent of insurance companies engaged in insuring property against loss or damage by fire; that during his incumbency as a trustee of the trust estate he had, as an employee of the trustees, performed clerical services in relation thereto, and in part compensation for such services had similarly enjoyed the privilege of writing one half of the fire insurance effected. by the trustees upon buildings belonging to the estate in respect of which he received commissions upon the premiums paid; that during the year 1938 and previously thereto, during the incumbency of John K. Clarke one of the trustees of the trust estate (appointed December 14, 1927), one half of the fire insurance effected by the trustees upon buildings belonging to the trust estate had been placed with the Bishop Insurance Agency, Limited, a local corporation, also the resident agent of insurance companies engaged in the fire insurance business in the Terri-

tory, and that the controlling stock in the Bishop Insurance Agency, Limited, was owned by the Bishop Trust Company, Limited, a Hawaiian corporation, of which Mr. Clarke was an officer and director.

Holding as we do that in the employment of the superintendent-secretary of the trust estate no abuse of discretion appears and that his compensation was reasonable, it becomes immaterial that the superintendent-secretary was compensated for his services in part by the commissions to be earned by him upon premiums paid for fire insurance effected by the trustees upon buildings of the trust estate. Further, assuming that the court had jurisdiction of the same subject matter in respect to compensation previously paid prior to the accounting period to Harry M. von Holt for clerical services rendered by him to the estate to the extent at least as the subject matter affected A. N. Campbell, one of the present trustees during his incumbency as a cotrustee of Harry M. von Holt, in the absence of any showing that his compensation was unreasonable, the same conclusion necessarily follows. Therefore any surcharge against the present trustees and/or their predecessors in respect to commissions received by the superintendent-secretary of the trust upon insurance effected through him by the trustees of the trust estate, was error. It was also error to surcharge the trustees and/or their predecessors with the amount of commissions received by Harry M. von Holt upon premiums paid for insurance effected through the predecessor trustees upon buildings of the estate unless it appears that while he was a trustee he personally profited at the expense of the estate and then only to the extent of such profit. Whether a surcharge might be proper will be developed upon our consideration of the surcharges of the commissions earned upon the one half of the fire insurance effected by the trustees through the Bishop Insurance

Agency, Limited. In surcharging the trustees and/or their predecessors with the commissions earned by the Bishop Insurance Agency, Limited, we believe the circuit judge also committed error. The evidence before him was insufficient to sustain his findings of fact and conclusions of law and if under the law governing the duties of fiduciaries any surcharge is in order, it must be restricted to the profit taken, the measure of which is not *per se* the commissions earned by the Bishop Insurance Agency, Limited.

In Restatement of the Law of Trusts, section 170, subsection (1), it is said in respect to the duty of loyalty: "The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary."

In its comment on the provisions of subsection (1), the Restatement adds: "*n. Bonus, commission or other compensation.* The trustee violates his duty to the beneficiary if he accepts for himself from a third person any bonus or commission for any act done by him in connection with the administration of the trust. Thus, if he sells trust property and accepts from the purchaser a bonus for making the sale, he commits a breach of trust. So also, if he is employed by an insurance company with which he insures trust property, receiving as compensation a commission for placing the insurance, he is accountable for the commission. If he were allowed to keep the commission he would be tempted to place the insurance with the company which employs him, even though that might not be for the best interest of the beneficiary."

Professor Bogert refers to the same subject matter in the following language: "A trustee who does insure should deal with an independent insurance agency and company. If he acts as insurance agent and takes a profit personally, he may be made to disgorge it; and the trustee's conduct in insuring in a company in which he

is an officer or large stockholder may also be subject to attack." 3 Bogert, Trusts and Trustees, § 599, p. 1906. In a note to the quoted excerpt, Bogert cites the case of *Fisher* v. *Fisher*, 170 N. C. 378, 87 S. E. 113. In that case exception was taken to the account of the trustee upon the ground that he had at different times insured the properties of the trust estate through agencies in which he had a pecuniary interest. The court held that there was nothing to show "that the insurance carried was other than good business management required, or that the rates were other than the ordinary rates for risks of like kind," and that it saw no reason for disallowing fees paid on the policies.

Professor Scott, in commenting upon the quoted excerpt from the Restatement (2 Scott, Trusts § 170.22, p. 903), cites in support thereof the case of *White* v. *Sherman*, 168 Ill. 589, 48 N. E. 126. In that case it appeared that the trustee was a member of an underwriters' association, by reason of membership in which he was entitled to receive and received a commission on premiums paid by him for the insurance of a hotel belonging to the trust estate. The court held the trustee liable for the full amount of the commissions shown to have been received by him on insurance premiums paid by him out of the trust funds, saying: "The law does not allow a trustee to retain any personal gain which he may obtain in such a manner as subjects him to the temptation of placing himself in a position which may be hostile to the interests of the estate, whether the estate is actually injured or not, as a matter of fact. The fact that he was receiving commissions might have subjected him to a temptation to place a larger line of insurance than was necessary on the trust property. It is not essential that the estate has suffered a loss from what he has done. It is sufficient that he has gained a profit. Whether the contract was

beneficial or injurious to the estate is wholly immaterial. An agent is only entitled to commissions upon a faithful performance of all the duties of his agency." (p. 134.)

Both the *Fisher* case and the *White* case were unquestionably correctly decided in respect to the facts disclosed by each case.

The record in the instant case, however, is in the utmost confusion. It does not appear that any specific issue was before the court upon the subject of the relation that Mr. Clarke bore to the Bishop Insurance Agency, Limited, by reason of his connection with the Bishop Trust Company. Nor can it be said that Mr. Clarke's relations with the Bishop Insurance Agency, Limited, at the time that the insurance was effected were of such a nature that it might be said that it was incumbent upon him to show affirmatively that he had not profited personally from the insurance effected. Nor does it appear that the insurance carried was other than good business management required or that the rates obtaining during the periods involved were other than the ordinary rates for risks of like kind. There was some evidence of uniformity of rates but this evidence was not specific as to time. It did not appear that Mr. Clarke was an employee of the insurance agency or that he was a stockholder in the insurance agency or a stockholder in the Bishop Trust Company. The evidence does not sustain the finding of the trial judge that he was "financially" interested in the insurance agency. Under the circumstances there was no foundation in fact for the application of the principles of law involved. Moreover, the present state of the record does not admit of findings of fact by this court or the application of the pertinent rules of law involved.

Nor did the circuit judge apply the correct rule of liability. Assuming *arguendo* that Mr. Clarke did take a profit personally within the meaning of the language of

Professor Bogert, heretofore quoted, it does not necessarily follow that the entire commissions received by the Bishop Insurance Agency, Limited, is the measure of that profit. It is a profit personally taken by Mr. Clarke, if any, and not the commissions enjoyed by the insurance agency, unless they are coextensive, that would be the subject of surcharge.

Upon this branch of the case, therefore, further proceedings are necessary to determine the facts as they existed during Mr. Clarke's incumbency and during the period that A. N. Campbell was a cotrustee with Harry M. von Holt. This is the province of the court *nisi*. Until the facts are determined it is impossible to apply the law. It would be unfair to both the beneficiaries and the trustees for this court to assume to determine the merits upon the record as it stands. The question involved is too important and any conclusion that we might reach too far-reaching to admit of anything short of a full, fair and complete investigation of the facts.

Consistently with our views herein expressed the decree settling the accounts for the calendar year ending December 31, 1940, is in all respects affirmed; the decree settling the accounts for the calendar year ending December 31, 1938, is reversed and the cause involving those accounts remanded to the circuit judge presiding at chambers for further proceedings consistent herewith.

*A. Perry* (*F. E. Thompson* on the briefs) for Abigail Kawananakoa, beneficiary.

*J. G. Anthony* (*Robertson, Castle & Anthony* on the briefs) for trustees.